UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 23 CR 220 |
| | ) | |
| MIGUEL LOPEZ | ) | Hon. John J. Tharp, Jr. |
| | ) | |

**DEFENDANT MIGUEL LOPEZ'S
OBJECTIONS TO THE PRESENTENCE INVESTIGATION REPORT
AND SENTENCING MEMORANDUM**

CECE WHITE
Nishay K. Sanan, Esq.
53 W. Jackson Blvd., Ste. 1424
Chicago, Illinois 60604
cece@sananlaw.com
(312) 692-0360

## TABLE OF CONTENTS

I.    Introduction .................................................................................................................1

II.   Objections to the PSR ..................................................................................................1

      A.   Factual Corrections                                                                                    1

      B.   Career Offender Enhancement                                                                          2

      C.   Alleged Relevant Conduct                                                                            4

      D.   Adjustment for Role in the Offense                                                                  7

      E.   Conditions of Supervised Release                                                                    7

III.  Sentencing Memorandum .............................................................................................8

      A.   The Nature and Circumstances of the Offense                                                         9

      B.   History and Characteristics of Miguel Lopez                                                        11

      C.   The Career Offender Enhancement                                                                    16

      D.   A Sentence of 63 Months is Sufficient but No Greater Than Necessary Comply with the
           Purposes of Sentencing                                                                            21

IV.   Conclusion ...................................................................................................................22

## TABLE OF CASES

                                                                                                    **Page**

*Borden v. United States*, 593 U.S. 420 (2021) ............................................................... 2

*Pennsylvania ex rel. Sullivan v. Ashe*, 302 U.S. 51 (1937)............................................ 8

*Williams v. New York*, 337 U.S. 241 (1949)................................................................. 8

*United States v. Acosta*, 85 F.3d 275 (7th Cir. 1996) ................................................... 5

*United States v. Bacallao*, 149 F.3d 717 (7th Cir. 1998)............................................... 6

*United States v. Baker*, 445 F.3d 987 (7th Cir. 2006) .................................................. 8

*United States v. Booker*, 543 U.S. 200 (2005)................................................... 1, 8, 17

*United States v. Butler*, 296 F.3d 721 (8th Cir. 2002) ............................................... 18

*United States v. Carr*, 107 F.4th 636 (7th Cir. 2024)......................................... 2, 3, 4

*United States v. Chagoya-Morales*, 859 F.3d 411 (7th Cir. 2017) ............................... 2

*United States v. Coleman*, 705 F. App'x 454 (6th Cir. 2017) ...................................... 18

*United States v. Corner,* 598 F.3d 411 (7th Cir. 2010) ................................................... 17

*United States v. Crockett*, 82 F.3d 722 (7th Cir. 1996) ................................................... 5

*United States v. Duenas-Alvarez*, 549 U.S. 183 (2007) ................................................ 3

*United States v. Maxfield*, 812 F.3d 127 (7th Cir. 2016) ................................................ 17

*United States v. Mullins*, 971 F.2d 1138 (4th Cir. 1992) ............................................... 5

*United States v. Ortiz*, 431 F.3d 1035, 1040 (7th Cir. 2005) ..................................... 5, 6

*United States v. Patzer*, 548 F. Supp. 2d 612 (N.D. Ill. 2008) ................................... 18

*United States v. Ruiz*, 178 F.3d 877 (7th Cir. 1999) ..................................................... 6

*United States v. Smith*, 109 F.4th 888 (2024) .............................................................. 3, 4

*United States v. Sykes*, 7 F.3d 1331 (7th Cir. 1993) ..................................................... 5

*United States v. Ward*, 144 F.3d 1024 (7th Cir. 1998) ............................................... 7, 9

Now comes the Defendant, Miguel Lopez, by and through his attorneys, Nishay K. Sanan and Cece White, and respectfully submits to this Honorable Court his Objections to the Presentence Investigation Report ("PSR") and Sentencing Memorandum, pursuant to Federal Rule of Criminal Procedure 32(c), *United States v. Booker*, 543 U.S. 200 (2005), and its progeny, as well as the factors enumerated in 18 U.S.C. 3553(a). Mr. Lopez respectfully requests a sentence of 60 months. In support, Mr. Lopez states as follows:

## I. Introduction

On May 30, 2024, Miguel Lopez was convicted after a jury trial of conspiracy to distribute cocaine in violation 21 U.S.C. § 846 and distribution of cocaine in violation of 21 U.S.C. § 841(a)(1). Probation has calculated a total offense level of 34 and a criminal history category VI, resulting in a guideline range of 262-327 months. PSR ¶ 90. This high guideline range results from a finding that Mr. Lopez qualifies as a career offender. *Id.* at ¶ 25. Without that enhancement, Mr. Lopez's offense level would be 24, his criminal history category would be IV, and his guideline range would be 77-96 months. Further, without the career offender enhancement, Mr. Lopez would qualify for a mitigating role adjustment and his guideline range would be 63-78 months. While Mr. Lopez concedes that the career offender enhancement applies under the guideline definition, he respectfully asks the Court to find that such a high sentence is not warranted here given the nature of Mr. Lopez's criminal history, his role in this offense, and the other mitigation presented below. He respectfully submits that a sentence of 63 months is sufficient but no greater than necessary to accomplish the purposes of sentencing.

## II. Objections to the PSR

### A. Factual Corrections

The PSR states that a firearm was used in aggravated robberies of which Mr. Lopez was convicted. PSR ¶¶ 36-37. To clarify, the weapon that was used was a B.B. gun. The PSR states that

1

Mr. Lopez and his fiancé, Anna Ires Uribe, are no longer a couple and are not in communication. *Id.*
at ¶ 56. While this was accurate at the time of the interview, the couple has since reconciled. Further,
the PSR states that Mr. Lopez only has one child. PSR at ¶ 56. It is true that Mr. Lopez has only one
biological child, but he considers Ms. Uribe's three children, who are 9, 6, and 4, as his own. The
PSR states that Mr. Lopez "hung around" with members of the MS-13 gang. PSR ¶ 61. The gang
that Mr. Lopez referred to was not MS-13; it was the Surenos gang.

### B. Career Offender Enhancement

Mr. Lopez objects to the application of the career offender enhancement to preserve legal
objections rooted in recent case law that could be successfully appealed. He further argues below in
his analysis of the § 3553(a) factors that the Court should disregard the application of the career
offender enhancement. The PSR applies the enhancement because Mr. Lopez was at least 18 years
old at the time of the offense, the offense of conviction is a felony that is a controlled substance
offense, and the defendant has two prior felony convictions for offenses qualifying as "crimes of
violence." U.S.S.G. § 4B1.1(a); PSR ¶ 25. Mr. Lopez's prior convictions are for aggravated robbery,
which the Seventh Circuit has previously held does qualify as a crime of violence under the guideline
definition. *See e.g., United States v. Chagoya-Morales*, 859 F.3d 411, 422 (7th Cir. 2017).

However, in *United States v. Carr*, the Seventh Circuit considered two arguments to the
contrary, specific to the same statute with which Mr. Lopez was convicted. 107 F.4th 636 (7th Cir.
2024). First, the Court considered whether aggravated robbery could still qualify as a crime of
violence given the Supreme Court's holding in *Borden v. United States* that a criminal offense with a
*mens rea* of recklessness does not qualify as a violent felony under the elements clause of the Armed
Career Criminal Act. *Carr*, 107 F.4th at 646-47 (citing *Borden v. United States*, 593 U.S. 420 (2021)). In
*Carr*, the Court found this argument had been forfeited but did note that there were valid arguments
suggesting that the Illinois robbery statute included recklessness as a possible mental state. *Id.* Later

in the same month, the Court rejected that argument in a case where the issue had not been forfeited, *United States v. Smith*, 109 F.4th 888 (2024). In *Smith*, the Court found that while the statute does arguably contain a recklessness mental state, the State of Illinois, in practice, would not have upheld a conviction for aggravated robbery if the defendant had only acted recklessly. *Id.* at 894-95. Thus, as the law currently stands, the robbery statutes with which Mr. Lopez was convicted qualify as crimes as violence.

The second argument considered in *Carr* was whether Illinois statutes defining accomplice liability were applied in a manner so unusually broad that anyone convicted of armed robbery in Illinois may have acted only as an accomplice. *Carr*, 107 F.4th at 647-48. If so, the defendant argued that this approach would be so outside of the mainstream approach of other jurisdictions that it would render Illinois robbery a categorical mismatch for generic robbery, and thus, it should not be considered a crime of violence for sentencing purposes. *Id.* at 648. The Supreme Court supported this type of argument in *United States v. Duenas-Alvarez* but found it did not apply to the case at hand. 549 U.S. 183 (2007). The Seventh Circuit debated the applicability of this argument to Illinois statutes at length, but ultimately rejected it, in part because of questions left open in the Supreme Court's decision. *Carr*, 107 F.4th at 670. For example, the Supreme Court did not address how to apply a categorial approach when accomplice liability need not be charged, but is inherent in every substantive criminal offense, as is the case in Illinois. *Id.* The Seventh Circuit asked, "does that disqualify all of the state's convictions as drug or violent-crime predicates for federal sentencing purposes?" *Id.* The Court ultimately held that "Until such questions are answered, we do not believe it is appropriate to discard [defendant's] prior convictions for robbery as sentencing predicates based solely on the theoretical possibility that [defendant] might have been convicted as an accomplice. *Id.* While the Seventh Circuit ultimately rejected this theory, the Court qualified its holding with "[u]ntil

we are told otherwise…," indicating that it saw support in the law for the Supreme Court to interpret this issue differently. *Id.* at 671.

Mr. Lopez's predicate convictions in support of the career criminal enhancement are violations of the same Illinois robbery statute addressed in *Carr* and *Smith*. Further, the PSR suggests that he was convicted of at least one of the predicate offenses on a theory of accomplice liability, having committed no violent act himself. PSR ¶ 36. Given the recency of these decisions and the possibility of contrary rulings on appeal, Mr. Lopez raises these objections to preserve them. However, he does concede that under the current law in this jurisdiction, the enhancement applies. Relatedly, the Defendant argues below that, as applied to him, the career offender enhancement overstates the seriousness of his criminal history and results in a guideline range that is far greater than necessary to achieve the purpose of sentencing.

### C. Alleged Relevant Conduct

The Defendant objects to the PSR's finding that the March 5, 2021 delivery of money qualifies as relevant conduct to the offense of conviction. PSR ¶ 19. However, the Defendant agrees with the PSR's finding that even if it was relevant conduct, no drug type or quantity can be attributed to the Defendant to increase his base offense level. *Id.* Further, Defendant acknowledges that a finding either way has no bearing on Mr. Lopez's total offense level because of the application of the career offender enhancement. *Id.* at ¶ 25. However, it is important that his guideline range be correctly calculated, especially if the Court agrees that the career offender enhancement would be appropriately disregarded in this case. Thus, the Court should rule that the uncharged conduct does not qualify as relevant conduct and cannot be used to increase the drug quantity involved in the offense.

When calculating the base offense level for a controlled substances offense, the Court may consider the types and quantities of drugs that were not specified in the counts of conviction but

4

were 'part of the same course of conduct or common scheme or plan' as the convicted offenses.
*United States v. Ortiz*, 431 F.3d 1035, 1040 (7th Cir. 2005); U.S.S.G. § 1B1.3(a)(2). Offenses are part of
the same course of conduct if they are "part of a single episode, spree, or ongoing series of
offenses." U.S.S.G. § 1B1.3(a)(2), App. Note 9. In assessing whether offenses are part of the same
course of conduct, the Court considers whether there is "a strong relationship between the
uncharged conduct and the convicted offense, focusing on whether the government has
demonstrated a significant 'similarity, regularity, and temporal proximity.'" *Ortiz*, 431 F.3d at 1040
(citing *United States v. Acosta*, 85 F.3d 275, 281 (7th Cir. 1996)). The Court has held that "the mere
fact that the defendant may have engaged in other drug transactions "is not sufficient to justify
treating those transactions as 'relevant conduct' for sentencing purposes." *Ortiz*, 431 F.3d at 1041
(quoting *United States v. Crockett*, 82 F.3d 722, 730 (7th Cir. 1996)).

Here, the government has failed to demonstrate that the uncharged conduct bears a strong
relationship to the convicted offense in similarity, regularity, or temporal proximity. First, there is a
temporal gap of 6 months between the two events. Courts have found that this length of time cuts
against a finding of relevant conduct. *See e.g., United States v. Mullins*, 971 F.2d 1138, 1144 (4th Cir.
1992) (temporary proximity "extremely weak" where uncharged occurred six months prior to the
offense of conviction). This gap between the uncharged and the charged conduct "tends to indicate
conduct that can easily be separated into 'discrete identifiable units' rather than behavior that is part
of the same course of conduct or common scheme or plan." *United States v. Sykes*, 7 F.3d 1331, 1337
(7th Cir. 1993) citing USSG §1B1.3 (background comment)).

When there is a temporal gap, "the government needs a stronger showing regarding the
other course of conduct factors, such as regularity or similarity of acts." *Ortiz*, 431 F.3d at 1041. The
government has not made such a showing here. There is no significant similarity or regularity
present between the alleged conduct and the convicted offense. Regularity requires a showing of

repeated similar behaviors such as weekly drug transactions involving the same parties. *See e.g. United States v. Ruiz*, 178 F.3d 877, 882 (7th Cir. 1999). Here, there are simply two discrete events and there can be no finding of regularity.

Further, there are more differences than similarities between the two events. In March 2021, the transaction was allegedly conducted on behalf of a Mexico-based narcotics broker named "Flaco," whereas the offense of conviction was conducted on behalf of "Dani." PSR ¶ 7; Government Version ("Govt. Vers.") at 2. The offense of conviction involved Mr. Lopez delivering cocaine to an undercover officer ("UC-1"). PSR ¶ 8. He refused to accept any money from UC-1 in exchange for the drugs until he was explicitly told to return and do so. *Id*. The alleged relevant conduct involves only the delivery of money from Mr. Lopez to UC-1. *Id*. at ¶ 9. No drugs were exchanged. *Id*. Mr. Lopez did not accept money or anything else from UC-1. *Id*. The events also took place at different locations – a Home Depot parking lot in March and the parking lot of a restaurant called Gary Burrito in September. Govt. Vers. at 2. Further, in March 2021, there was a specific modus operandi not present in the offense of conviction. Specifically, Mr. Lopez allegedly used a serial number from a dollar bill, which matched that UC-1 had in his possession, to prove that he was acting behalf of "Flaco." *Id*. There is no similar fact present in the offense of conviction.

The Seventh Circuit has explicitly rejected the consideration of additional drug transactions when there is "no explanation indicating how the alleged [transaction] involved the same purpose or modus operandi as the convicted offense." *Ortiz*, 431 F.3d at 1042 (quoting *United States v. Bacallao*, 149 F.3d 717, 719 (7th Cir. 1998). Here, the alleged relevant conduct does not explicitly involve a drug transaction, let alone one that involved the same purpose or modus operandi as the convicted offense. The only similarity here is the involvement of UC-1 and the fact that events took place at locations within the city of Carol Stream, Illinois. This is not sufficient. The two events are discrete events occurring 6 months apart that involve different participants, take place at different locations,

have different purposes, a different modus operandi, and overall involve completely different facts. For these reasons, the Court should find that the uncharged conduct does not qualify as relevant conduct to the offense of conviction.

However, should the Court find that it is relevant conduct, the Court should nonetheless find that it cannot be used to increase Mr. Lopez's offense level based on an additional quantity of drugs. There were no drugs exchanged in the March 2021 transaction. Despite that, the government asks this Court to find that the alleged delivery of money involved four kilograms of cocaine, an amount over 4 times higher than that involved in the offense proven at trial. The PSR correctly concluded that even if this alleged event is relevant conduct, there is no "drug type or quantity [that] can reasonably be attributed to the defendant." PSR ¶ 19. For these reasons, the Court should not use this uncharged conduct to increase Mr. Lopez's offense level.

### D. Adjustment for Role in the Offense

Probation presents some facts in support of finding a mitigating role, but ultimately finds that it should not be applied. *Id.* at ¶ 22. Mr. Lopez objects because a mitigating role adjustment is appropriate here under the guideline definition. *See* U.S.S.G. § 3B1.2. However, the Seventh Circuit has held that a career offender is not eligible for a reduction for a role in the offense. *United States v. Ward*, 144 F.3d 1024, 1036 (7th Cir. 1998). For this reason, Mr. Lopez will address those facts that would support a deduction based on his mitigating role within his § 3553(a) factor analysis below.

### E. Conditions of Supervised Release

The Defendant objects to Discretionary Condition No. 7 stating that he shall refrain from the use of any alcohol. PSR at p. 22 ¶ 7. Mr. Lopez requests that the Court amend the proposed condition to state that he shall refrain from "excessive" use of alcohol as opposed to "any."

The Defendant objects, in part, to Discretionary Condition No. 16 which states that a probation officer may visit him at home, work, or other reasonable locations. *Id.* at p.23 ¶ 16. Mr.

7

Lopez objects only to visits at work. Mr. Lopez will need to find a new profession after his release and obtaining employment as a convicted felon can prove difficult. Once he is employed, visits from a probation officer could jeopardize his ability to earn a living. The remainder of this condition should provide sufficient opportunity for visits.

## III.    Sentencing Memorandum

After considering the factors under 18 U.S.C. § 3553(a), this Court should find that a sentence of 63 months is sufficient but not greater than necessary to accomplish the goals of sentencing. After the Supreme Court's ruling in *Booker*, a District Court has significantly more freedom to fashion an appropriate sentence. *See United States v. Baker*, 445 F.3d 987, 991 (7th Cir. 2006) (citing *Booker*, 543 U.S. 220). Specifically, the United States Sentencing Guidelines are merely "advisory," and sentencing courts are required to consider all factors listed in 18 U.S.C. § 3553(a) in imposing a sentence. *Booker*, 543 U.S. at 245. Where the defense raises § 3553(a) factors in requesting a below guidelines sentence, the Court must conduct a meaningful analysis of how those § 3553(a) factors apply to the facts and explain why its sentence is appropriate under § 3553(a). *Id.* at 675-76.

The primary directive in § 3553(a) is that the Court must impose a sentence that is "sufficient but not greater than necessary" to comply with the purpose of sentencing, namely (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. § 3553(a)(2). The main goal of using the sentencing factors is to consider each person appearing before the court as an individual because the "punishment should fit the offender and not merely the crime." *Williams v. New York*, 337 U.S. 241, 247 (1949); *see also Pennsylvania ex rel. Sullivan v. Ashe*, 302 U.S. 51, 55 (1937). Here, the most appropriate sentence to comply with the purpose of

sentencing, while accounting for Mr. Lopez as an individual, is a term of 63 months.

## A. The Nature and Circumstances of the Offense

The Court must consider the nature and circumstances of the offense when determining the sentence to be imposed. 18 U.S.C. § 3553(a)(1). As the PSR describes, Mr. Lopez was convicted of conspiring to distribute and distributing cocaine based on his delivery of 985 grams of cocaine to UC-1 in exchange for $34,000. PSR ¶ 8. Mr. Lopez committed very serious offenses, and he deeply regrets his actions. He makes no excuses for his conduct, but there are facts in mitigation that he asks this Court to consider when weighing the nature and circumstances of the offense. First, it is important to note that Mr. Lopez's conduct was nonviolent. Though Mr. Lopez does not deny that controlled substances can pose a danger to the communities in which they are distributed, he did not personally use violence to distribute them. He did not carry a firearm or other dangerous weapon when conducting the transaction. *Id.* at ¶ 11. There are no allegations that he was connected to, or aware of, any violence that may have occurred elsewhere in the chain of distribution.

In further mitigation, the nature and circumstances of the offense indicate that Mr. Lopez was a minor participant in a larger drug conspiracy. As previously stated, Mr. Lopez cannot technically dispute the PSR's failure to adjust his guideline range because he is ineligible for a mitigating role adjustment as a career offender. *See Ward*, 144 F.3d at 1036. However, the Court should nonetheless consider the facts that support such an adjustment as mitigation indicating a reduced sentence is warranted. The mitigating role adjustment is applied if the defendant is substantially less culpable than other participants in the criminal activity. U.S.S.G. § 3B1.2 App. Note 3. In this determination, the Court considers the following factors:

> (i) the degree to which the defendant understood the scope and structure of the criminal activity;
>
> (ii) the degree to which the defendant participated in the planning or organizing of the criminal activity;
>
> (iii) the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority;

9

(iv)    the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts;

(v)    the degree to which the defendant stood to benefit from the criminal activity.

*Id.* at App. Note 3(C).

Here, the factors indicate that Mr. Lopez was a minor participant. First, as the PSR acknowledges, there is no evidence suggesting that Mr. Lopez had any knowledge of the scope and structure of the criminal activity nor that he had any decision-making authority or control over other participants. PSR ¶ 22. His role appears to have been limited to delivery. Further, the evidence suggests that he did not have any discretion when performing this limited role. For example, when he delivered the cocaine, UC-1 attempted to pay him. Mr. Lopez refused to accept the funds because "he was not told anything about the purchase price." *Id.* at ¶ 8. After Mr. Lopez left, UC-1 called "Dani" who said he'd instruct Mr. Lopez to pick up the money. *Id.* It was only then that Mr. Lopez returned and accepted the funds. This exchange demonstrates that Mr. Lopez had no decision-making authority or discretion in his role; he acted only on explicit orders from someone else.

Finally, there is no evidence to suggest that Mr. Lopez stood to benefit from the drug conspiracy at large. The government presented no evidence that Mr. Lopez received any kind of payment, let alone one indicating he had an interest in the conspiracy at large. For example, there was no evidence suggesting that he received a percentage of the conspiracy's overall earnings nor was there evidence that his payments, to the extent that they existed, were contingent on profits. The guidelines state that "a defendant who does not have a propriety interest in the criminal activity and who is simply being paid to perform certain tasks should be considered for a [mitigating role] adjustment." U.S.S.G. § 3B1.2 App. Note. 3(C). This accurately describes Mr. Lopez's role. There was no evidence proving that Mr. Lopez was paid for this delivery of controlled, but even if he had been, such a payment would be for performing the certain task of delivery. Thus, he had no propriety interest in the criminal conspiracy at large.

To the extent that the Court decides to consider the alleged March 2021 event as relevant conduct, the facts similarly support the finding that Mr. Lopez was a minor participant. There, the defendant allegedly delivered money to UC-1 who asked Mr. Lopez if he knew of anyone who had "material" to sell. PSR ¶ 9. Mr. Lopez allegedly replied, "I could ask my boss, but… if my boss tells me to move it, I'll move it." *Id.* This again demonstrates a lack of control and decision-making power. It further demonstrates a total lack of knowledge on a topic as basic to a drug conspiracy as whether any type of drug was currently available for purchase.

In short, Mr. Lopez delivered cocaine because he was instructed to by someone who had control over him. He had no knowledge of the structure or scope of the conspiracy, no exercise of discretion, and no control over other participants. The guideline states that "a defendant who is convicted of a drug trafficking offense, whose participation in that offense was limited to transporting or storing drugs and who is accountable under §1B1.3 only for the quantity of drugs the defendant personally transported or stored" may receive the mitigating role adjustment. U.S.S.G. § 3B1.2 App. Note. 3(A). This is the exact scenario before the Court. Thus, while Mr. Lopez does not technically qualify for the adjustment because of the career offender enhancement, his mitigating role in the offense nonetheless supports his request for a below-guidelines sentence. The lowest mitigating role adjustment deduction of 2-points would result in a total offense level of 22 if the career offender enhancement were not applied and Mr. Lopez's resulting guideline range would be 63-78 months.

### B.  History and Characteristics of Miguel Lopez

In determining the appropriate sentence, the Court must consider the "history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1). Mr. Lopez's history and characteristics indicate that he is ready and able to live a productive, law-abiding life after he serves his sentence. He has strong family support, a stable employment history, and a sincere motivation to turn his life around. Mr. Lopez's history and characteristics suggest that a below-guidelines sentence would

provide just punishment while allowing Mr. Lopez the opportunity to support his young daughter and continue his efforts towards rehabilitation while he is still a young man.

Miguel Lopez is one of four children born to his parents Jesus and Josefina. PSR ¶ 50. He was born in Colorado, but when he was young, his family moved to Guanajuato, Mexico where they lived for approximately five years. *Id.* at ¶ 59. The family returned to Streamwood, Illinois when Mr. Lopez was around 8 years old. *Id.* Since then, he and his immediate family members have all resided in Streamwood or the greater Chicago area. He has a positive relationship with his family members and is particularly close with his mother and oldest brother Rafael. Mr. Lopez's parents have been married for about 40 years, but when Mr. Lopez was a young child, they were separated. *Id.* at ¶ 50. During this time, Mr. Lopez's father was not involved in his life. *Id.* at ¶ 52. However, after the couple reconciled, his father became more present. *Id.* Although Mr. Lopez's father struggles to show emotion or display affection with his son, Mr. Lopez understands that this is just how his father was raised. *Id.* at ¶ 53. Mr. Lopez knows that he is lucky to have grown up in a family where his needs were met and where he knew he was loved.

On the other hand, there were difficult moments in Mr. Lopez's childhood and young adulthood. He was sexually abused twice between the ages of 8 and 10. *Id.* at ¶ 51. These events very clearly affected Mr. Lopez who is not comfortable discussing any details even today. He refuses to identify the perpetrators by name, but the first instance occurred in Mexico when he was approximately eight years old and involved a male extended relative. *Id.* The second instance of sexual child abuse took place after his family returned to the United States and involved a female extended relative. *Id.* Mr. Lopez has never told his parents or other family members about this abuse, nor has he ever reported his abusers. *Id.* He understandably finds this difficult to talk about, but early childhood sexual abuse at the hands of trusted family members surely had a great impact on Mr. Lopez's mental and emotional health. Mr. Lopez also struggled in school as a child. He was diagnosed

12

with a learning disability by a school psychiatrist at Canton Middle School in Streamwood, Illinois. *Id.* at ¶ 65. He took special education courses but continued to struggle regardless. *Id.* He was ultimately able to graduate high school, although he had poor grades and felt that he had "barely made it." *Id.* at ¶ 75.

As a teenager and young man, Mr. Lopez frequently spent time at his grandparents' house in Chicago where his cousins who were associated with gangs lived. *Id.* at ¶ 52. He remembers the police searching his grandparents' house on more than one occasion. *Id.* Further, he noted that alcohol was always present, something that he thought was normal at the time. *Id.* Mr. Lopez never personally identified as a member of any gang, but he spent time with members of the Latin Kings, Maniac Latin Disciples, and Surenos.[1] *Id.* at ¶ 61. Unfortunately, Mr. Lopez was heavily influenced by his friendships with these young men which led him to engage in early substance abuse and eventually get involved in crime. While he certainly accepts responsibility for his own choices, he understands in hindsight that he should have surrounded himself with better influences.

Mr. Lopez started abusing drugs and alcohol at a young age. He started drinking when he was only 12 years old and even at this young age, he was drinking at least once a week. *Id.* at ¶ 70. Mr. Lopez has been drinking heavily ever since. By age 15, he was drinking a 40-oz beer every day. *Id.* In his 20's, he started drinking a 6-pack or 12-pack every day and eventually he was drinking so much that he stopped keeping track. *Id.* He continued to do so until he was detained following his conviction in this case. He also started experimenting with drugs when he was young. *Id.* at ¶ 71. He was 14 when he first tried marijuana and by age 25, he was smoking large amounts every day. *Id.* He experimented with hallucinogens for a few years starting when he was 18 years old. *Id.* He also used cocaine at least once a week from the ages of 18 to 20. *Id.* It was during this period of heavy drug use that Mr. Lopez participated in three aggravated robberies, the details of which are covered in more detail below. After

---

[1] The PSR states that Mr. Lopez was associated with MS-13, but this is an error.

13

his release from the Illinois Department of Corrections at age 24, Mr. Lopez remained clean while on parole, but he ultimately slid back into old habits and continued to use cocaine. Mr. Lopez's drug use contributed to his decision to commit the instant offense. *Id.* at ¶ 72. He used to believe that all people abused drugs and thought it was normal, but thinking back on it now, he stated, "I didn't realize I was losing myself." *Id.* Today, Mr. Lopez admits that he has addiction issues and hopes to receive treatment to ensure he does not fall back into these habits after his release. *Id.* at ¶ 73.

While he has struggled with issues in the past, Mr. Lopez has more recently made substantial efforts towards bettering himself. First, Mr. Lopez no longer uses any controlled substances. As the PSR notes, he has submitted 25 urine samples for drug testing in the last year and all tests were negative for the presence of illegal drugs. *Id.* Further, Mr. Lopez recently started a family of his own. Prior to his arrest, he was in a committed relationship with Anna Ires Uribe and the couple welcomed a daughter in May 2024. *Id.* at ¶ 56. While it is true that Mr. Lopez and Ms. Uribe became a couple in 2021, they have been close friends for years. Mr. Uribe has three children from a prior relationship who are 9, 6, and 4 years old. *Id.* While he is not their biological father, Mr. Lopez has been very involved in their upbringing since they were born and has supported them both as a father figure and financially. They are his children regardless of sharing no biological connection. Further, Mr. Lopez and Ms. Uribe have reconciled since the presentence interview was conducted. They are engaged to be married and Ms. Uribe and the children visit Mr. Lopez in custody at least twice a month. Mr. Lopez's deepest regret is that his involvement in this case took him away from his children. When asked about the future, he stated, "I just want to get out as soon as possible to be there for my daughter." *Id.* at ¶ 68.

Mr. Lopez's motivation to better his life is also demonstrated by his stable employment history and recent educational pursuits. He has been continuously employed throughout his adult life. Id. at ¶¶ 80-82. He worked for two years as a soft drink machine assembly worker and only left this position

14

because the company closed. *Id.* at ¶ 82. Mr. Lopez then immediately found new employment at Marmon Food Services where he worked in maintenance for 6 years. *Id.* at ¶ 81. Mr. Lopez was terminated from this position because of his arrest in this case. *Id.* However, he quickly found a new position while on pretrial release working for Amazon as a delivery driver, forklift operator, order picker, and dispatcher. *Id.* at ¶ 80. Mr. Lopez also recently decided to pursue a career as an electrician. In November 2019, he enrolled in the Stratford Career Institution's electrician program. *See* Supp. PSR. Despite his learning disability, Mr. Lopez has done exceedingly well in this program, having completed 13 examinations with an overall grade average of 92 percent prior to his arrest. *Id.* He plans to finish this course upon his release and find work as an electrician. PSR ¶ 78. While in custody, he hopes to remain productive by taking as many classes as possible and working in multiple positions in the correctional center. *Id.* at ¶ 68. He sought out and received a work assignment in the kitchen at the MCC. Further, while most courses are not available to pretrial detainees, he has completed 4 courses in custody and is on the waiting list for others including RDAP, the Bureau of Prison's most intensive substance abuse treatment course. *See* Certificates of Completion attached as **Exhibit A.**

This stable work history and motivation to remain productive suggests that Mr. Lopez will be successful in new employment after his release. This sentiment is echoed in a letter of support submitted by his former boss at Marmon Food Services, Tom Foley. *See* Letters of Support attached as **Exhibit B** at p. 1. In his letter, Tom Foley describes Mr. Lopez as his top employee. *Id.* He describes how Mr. Lopez stepped up and took over the maintenance for an entire facility when the pandemic caused issues with the business. *Id.* He knew Mr. Lopez to be a responsible person with a strong work ethic who was making efforts to build a life for his family. *Id.* Despite knowing the crime that Mr. Lopez committed, Tom Foley wrote that he truly believes Mr. Lopez is someone who can get back to a productive and positive life after his release. *Id.*

This and the other letters submitted in Mr. Lopez's support demonstrate his character as well

as the strong support system he will have after his release. The letters describe Mr. Lopez as a man with a big heart who always supports his family and friends. For example, his mother describes how he helps her keep track of taking her medications and takes her to doctor's appointments or to run errands. *Id.* at p.2. Mr. Lopez's aunt describes him taking care of her in similar ways because she has no children of her own. *Id.* at p.5. His father writes that Mr. Lopez is sorely missed at home. *Id.* at p.3. He describes how his son helps to support the family financially when his job as a roofer goes through slow periods. *Id.* Mr. Lopez's younger brother describes Mr. Lopez as someone that he can count on in any situation. *Id.* at p.4. He describes a time that his brother drove for hours to pick him up in another state when he was stranded without a ride. *Id.* Mr. Lopez's nephew recalls how his uncle walked him to his first day of school and helped him learn how to handle his nerves, a lesson he now returns to whenever he feels anxious. *Id.* at p.7.

All of the letters stress two important points. First, each person writes that despite the crime that he has committed, Mr. Lopez has their support now and will have their support upon release. Second, Mr. Lopez's family and friends write of the effort that they have personally seen Mr. Lopez make in the past few years towards becoming a better man. This outpouring of support from Mr. Lopez's family and friends demonstrates that he is a part of a strong community of individuals who he has helped countless times and who will now help him in return. There is no denying that Mr. Lopez committed serious offenses but since then, he really has taken substantial steps towards rehabilitation and will continue to do so after his release. He asks that this Court sentence him to a below-guideline sentence that will enable him to continue working towards a career and supporting his family while he is still a young man.

### C. The Career Offender Enhancement

The Court should find that the application of the career offender enhancement in this case yields a sentence far greater than necessary to accomplish the goals of sentencing. The sentencing

16

guidelines are advisory, and judges may vary from their recommendations if they respect all statutory requirements. *Booker*, 543 U.S. 200. Here, the statutory requirement by which this Court is bound is a five-year minimum term of imprisonment and a maximum term of 40 years. PSR ¶ 89. Outside of this statutory limit, it is within a District Court's discretion to reject *any* guideline on policy grounds. *United States v. Corner*, 598 F.3d 411, 415 (7th Cir. 2010) (emphasis in original). The Court may disregard the career offender enhancement if it disagrees with its application to a particular defendant and may sentence a career offender below the guidelines range on that basis. *Id.* at 416.

Further, while variances and departures are technically obsolete after *Booker*, the Court can be guided by them and "apply them by way of analogy" as mitigating factors that support a sentence below the guideline range. *United States v. Maxfield*, 812 F.3d 1127, 1129-30 (7th Cir. 2016). For example, the Court may consider whether "reliable information indicates that the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes," in determining whether to depart from the guideline range suggested by the career offender enhancement. U.S.S.G. § 4A1.3(b). In choosing to disregard the career offender enhancement although it technically applies, Court have looked at multiple factors such as the nature and circumstances of the past offenses, the length of time that has elapsed since the past offenses, the defendant's age, addiction and mental health issues at the time of the past offenses, the sentences the defendant previously served compared to the sentence suggested by the career offender enhancement, and the impact of the career offender enhancement on the defendant's guideline range. *See e.g., United States v. Coleman,* 705 F. App'x 454, 455 (6th Cir. 2017); *United States v. Butler*, 296 F.3d 721, 724-25 (8th Cir. 2002); *United States v. Patzer*, 548 F. Supp. 2d 612, 616-17 (N.D. Ill. 2008).

Examining similar factors in this case demonstrates that the career offender enhancement must be disregarded to reach a fair and just sentence. Mr. Lopez's prior offenses are convictions for

aggravated robberies that took place thirteen years ago when he was 20 years old. PSR ¶¶ 25, 36-37. At that time, he had been associating with gang members and he was heavily abusing drugs and alcohol. *Id.* at ¶¶ 52, 70-71. He was drinking at least a six-pack of beer every day, smoking marijuana every day, taking hallucinogenic mushrooms and LSD whenever they were available to him, and using cocaine multiple times a week. *Id.* at ¶¶ 70-71. He was intoxicated with alcohol, marijuana, and cocaine when he participated in the robberies.

Mr. Lopez did not take part in any violence nor carry a weapon. In the first robbery, occurring in Hanover Park, Mr. Lopez remained in the car while the robbery took place. *Id.* at ¶ 36. In the second robbery, occurring in Woodstock, he appears to have entered the liquor store during the robbery, but he did not interact with anyone or make any threats. *See* Woodstock Reports (attached to PSR). Reports describing the details of the third robbery occurring in Streamwood have not been received. PSR ¶ 35. The police reports that are available confirm that Mr. Lopez did not carry a weapon. *See* Woodstock Reports; Hanover Park Reports. One of his codefendants carried a knife and another carried what is described in the PSR and reports as a "firearm," but this weapon ultimately turned out to be a B.B. gun. *Id.* (Woodstock Officer Reitz supplementary report). While his codefendants pointed a knife or B.B. gun and made threats, Mr. Lopez was either outside in the car or merely standing nearby. Further, none of the stolen items from the robberies were located when Mr. Lopez's house was searched. The stolen items, B.B. gun, and knife were all seized during searches of Mr. Lopez's codefendants.

Further, it is important to note that the three robberies took place within days of each other in the same week in November 2011. Each of the robberies resulted in a separate criminal case and Mr. Lopez ultimately pled guilty in all three. PSR ¶¶ 36-37. He was sentenced to a term of seven years for the Streamwood and Hanover Park robberies and a concurrent sentence of four years for the Woodstock Robbery. *Id.* He ultimately served only three years and nine months before he was released

on parole, which he completed successfully without incident. *Id.* Other than these three robberies occurring in one week in 2011, Mr. Lopez has no other past convictions.

None of these details change the fact that Mr. Lopez participated in serious crimes, and he does not seek to minimize his past. However, these details do suggest that the career offender guideline overstates his criminal history and likelihood for recidivism. At the time of his prior offenses, Mr. Lopez was a drug-addicted young man who participated in robberies as an accomplice while under the influence of multiple substances over the span of a single week. Further, while Mr. Lopez does not contest that these were separate convictions, his case demonstrates how arbitrary the application of the career offender enhancement can be - Had Mr. Lopez been charged for these three robberies in a single indictment, he would not be subject to the career offender enhancement. Had Mr. Lopez been sentenced for these three robberies on the same day, he would not be subject to the career offender enhancement. *See* U.S.S.G. § 4B1.1(b)(2); § 4A1.1(d). In short, Mr. Lopez is a career offender based on a "career" that began on November 8, 2011 and ended on November 14, 2011. He is not the lifelong repeat violent offender that the guideline enhancement is intended to target.

This is especially clear when comparing Mr. Lopez to other offenders to whom the enhancement applies. The United States Sentencing Commission has collected data demonstrating that about half of those to whom the career offender enhancement applies see no change to their criminal history category.[2] This means that, even without the enhancement, their prior convictions would place them in the highest possible criminal history category. Mr. Lopez's criminal history category is increased by two entire levels, from category IV to category VI, solely based on the enhancement. PSR ¶ 40-41. Further, nearly all career offenders see an increase to their offense level because of the application of the enhancement, but the increase is 6 points on average.[3] Here, Mr.

---

[2] Quick Facts: Career Offenders, United States Sentencing Commission (2023), available online at: https://www.ussc.gov/research/quick-facts/career-offenders
[3] *Id.*

Lopez's offense level is increasing from 24 to 34 for a total of 10 points. *Id.* at ¶¶ 24-25. The overall impact of the enhancement is to increase his guideline range from 77-96 months, or 6-8 years, to 262-327 months, or 22 to 27 years. Mr. Lopez previously served a sentence of less than 4 years for the offenses that qualify him as a career offender, but those same offenses, for which he already served his time, now have him facing 22 to 27 years in prison. Such a sentence would be far greater than necessary.

Further, Sentencing Commission statistics suggest that a sentence within the guideline range for Mr. Lopez would result in an unwarranted sentencing disparity. Only 20% of offenders to whom the career offender enhancement applies receive a sentence within the resulting guideline range.[4] In 80% of career offender cases throughout the United States, the Court finds that a sentence below the guideline range is appropriate. There is not sufficient aggravation present in this case to suggest that Mr. Lopez should be amongst the minority of career offenders who receive guideline sentences.

His prior offenses, while serious, took place within a single week when Mr. Lopez was only 20 years old. Mr. Lopez's young age at the time of these prior offenses is especially relevant because of a guideline amendment effective on November 1, 2024, which states that a downward departure may be warranted in cases in which the defendant was youthful, meaning under 25 years old, at the time of the instant offense or any prior offenses. U.S.S.G. § 5H1.1. This amendment was the result of testimony from neuroscientists and psychologists describing the cognitive changes that last into the mid-20's and affect individual behaviors and culpability.[5] Further, Mr. Lopez did not personally make any threats, partake in any violence, or carry a weapon. Multiple mitigating factors suggest that Mr. Lopez is not the typical "career offender," contemplated within the guideline manual. Mr. Lopez does not deny that he committed a serious offense that requires just punishment, but a sentence between

---

[4] *Id.*

[5] 2024 Amendments in Brief: Youthful Individuals, United States Sentencing Commission (2024), available online at: https://www.ussc.gov/policymaking/amendments/2024-youthful-individuals-amendment

22 and 27 years is certainly not warranted. For these reasons, the Court should disregard the application of the career offender enhancement as a part of its factor analysis to arrive at a just and appropriate sentence.

### D. A Sentence of 63 Months is Sufficient but No Greater Than Necessary Comply with the Purposes of Sentencing

The primary directive in § 3553(a) is that the Court must impose a sentence that is "sufficient but not greater than necessary" to comply with the purpose of sentencing, namely (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. § 3553(a)(2).

Here, the sentence that best meets this purpose, while accounting for Mr. Lopez as an individual, is a sentence of 63 months. This number represents the low end of the guideline range that would result if Mr. Lopez was not a career offender and was eligible to receive an adjustment for his mitigating role. A sentence of 63 months would afford adequate deterrence in that it would be the longest sentence Mr. Lopez has ever served, having previously been incarcerated in the Illinois Department of Corrections for 3 years and 9 months. A sentence within the guideline range – over 22 years – would be significantly more than what is required for deterrence. Further, other factors suggest that Mr. Lopez is at lower risk of recidivism such as his stable employment history and the substantial steps he took towards rehabilitation prior to his arrest for this case. A sentence of 63 months would also allow Mr. Lopez to return to his needed vocational training as an electrician and support his children while he is still a young man. Mr. Lopez was a young man when he committed prior offenses over 13 years ago but his conduct since then demonstrates that he has a sincere motivation to lead a productive life after his release. A term of imprisonment of 63 months

21

is a significant sentence that reflects the seriousness of the offense, promotes respect for the law, and provides just punishment, while a sentence within the guideline range suggested by the career offender enhancement goes far beyond what is necessary.

## IV. Conclusion

For these reasons, the Defendant, Miguel Lopez, respectfully requests that this Court sentence him to a term of 63 months imprisonment.

Respectfully submitted,

*/s/ Cece White*
Attorney for Miguel Lopez

CECE WHITE
Nishay K. Sanan, Esq.
53 W. Jackson Blvd., Suite 1424
Chicago, Illinois 60604
(312) 692-0360
cece@sananlaw.com

22